**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS CHIN,<br><br>                              *Plaintiff,*<br><br>           v.<br><br>NEW YORK CITY, and THE OFFICE OF<br>THE SPECIAL COMMISSIONER OF<br>INVESTIGATION FOR THE NEW YORK<br>CITY SCHOOL DISTRICT,<br><br>                              *Defendants.* | **Civ. No.  19-5905**<br><br>**COMPLAINT** |

Plaintiff Thomas Chin, by and through his attorney Karen Kithan Yau, Of Counsel, Kakalec Law PLLC, as and for his Complaint, alleges as follows:

<u>Preliminary Statement</u>

1.     Plaintiff Thomas Chin (a/k/a Tom Chin) (hereafter referred to as "Plaintiff" or "Investigator Chin") brings these claims against Defendants New York City and the Office of the Special Commissioner of Investigation for the New York City School District (hereafter referred to collectively as "SCI"), alleging that Defendants discriminated against Plaintiff based on his race. Specifically, Plaintiff alleges that he was discriminated against, not promoted, not offered any meaningful opportunity to apply for promotions or transfers, and discriminatorily disciplined because of his race, i.e., because he is Chinese-American.  He also alleges that he was unjustly and unlawfully reprimanded and disciplined in retaliation for complaining about such discrimination.

2.      To remedy these legal violations, Plaintiff brings this action under 42 U.S.C. § 1981 ("Section 1981"); the New State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq. ("City Law").

Jurisdiction and Venue

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

4.      The Court has jurisdiction over Plaintiff's pendant state and city law claims under supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Plaintiff's state and city law claims are parts of the same case or controversy as Plaintiff's federal claim.

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391. A substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

6.      Defendants reside and/or do business in this district.

Parties

7.      Investigator Chin is a resident of Queens county in New York State who has been employed by Defendants SCI since October 16, 2006. At all times relevant to this action, Plaintiff has been an "employee" of the Defendants within the meaning of Section 1981, the NYSHRL, and the City Law.

8.      Defendant New York City is and has been at all times relevant to this action an "employer" of Plaintiff within the meaning of Section 1981, the NYSHRL, and the City Law.

9.      Defendant SCI is a New York City agency with its principal place of business located at 80 Maiden Lane, 20th Floor, New York, NY 10038. SCI was

established as a result of the findings and recommendations of the 1990 Joint

Commission on Integrity in Public Schools to investigate criminal activity or misconduct,

including corruption, unethical conduct, or sexual abuse of students within the New York

City Department of Education (DOE).

10.     At all times relevant to this action, SCI is and has been an "employer" of

Plaintiff within the meaning of Section 1981, the NYSHRL, and the City Law.

Factual Allegations

11.     Plaintiff Thomas Chin is currently a Confidential Senior Investigator at

SCI and began working there on October 16, 2006. Investigator Chin was born in the

Bronx and is Chinese-American.

12.     Before working for SCI, Investigator Chin worked in the New York Police

Department ("NYPD") for 20 years. Investigator Chin had worked in many of NYPD's

major squads, including Queens Homicide Squad, Queens Major Case Squad, and the

Asian Crime Investigative Unit of the Queens Robbery Squad. Investigator Chin gained

substantial investigatory experience, including significant experience working with sex-

crime victims from working in the prestigious Special Victims Squad in Queens. After

only 12 years in the NYPD, Investigator Chin was promoted to Detective – First Grade,

an elite designation for NYPD's most senior and experienced investigators that is usually

achieved after many more years of experience. Over the course of his career at NYPD,

Investigator Chin received numerous medals and awards. Investigator Chin retired from

NYPD in July 2004.

13.     In October 2006, Investigator Chin left his work as a private investigator

and returned to public service and began working for SCI.

*SCI Failed to Promote Investigator Chin and Discriminately Disciplined Him because of His Race*

14.     During his employment with SCI, Investigator Chin has been assigned to Team 1, a team that exclusively investigates sex-related crimes involving DOE students, which are considered the highest priority among SCI cases. Thus Investigator Chin has been assigned a significant caseload of sensitive matters. Historically investigators who are in Team 1, like Investigator Chin, are highly-trained and have experience working with sex crime victims.

15.     When he joined SCI in 2006, Investigator Chin was one of two Chinese-Americans who held the title "Investigator," out of approximately three-dozen investigators at SCI at the time. The other Chinese-American Investigator was a woman auditor who passed away while she was employed at SCI. Upon information and belief, she was a part of the founding staff at SCI and was never promoted.

16.     Currently, Investigator Chin is again the only one of two Chinese-American investigators, out of approximately 30 investigators at SCI. The other Chinese-American who holds the title "Investigator" now is another woman auditor in her 20's.

17.     Through the 12 years of Investigator Chin's employment at SCI, upon information and belief, in addition to these two auditors, there have been only two other Chinese-American investigators, both men. Neither received a promotion during the time they were employed at SCI. Upon information and belief, during this period, SCI only employed one other Asian-American investigator, a South Asian man.

18.     Upon information and belief, during the 12 years of Investigator Chin's employment, and at all times relevant to this action, the vast majority of SCI investigators who were hired were non-Chinese.

19.     Upon information and belief, during the 12 years of Investigator Chin's employment, and at all times relevant to this action, the vast majority of SCI investigators who have been promoted were non-Chinese.

20.     Upon information and belief, during the 12 years of Investigator Chin's employment, and at all times relevant to this action, the vast majority of SCI investigators who were given opportunities for job transfers were non-Chinese.

21.     Investigator Chin's investigatory work at SCI has been lauded. His work has led to numerous arrests of teachers who were credibly accused of raping, sexual abusing, and coercing sexual relationships with students. Many of Investigator Chin's cases were deemed newsworthy and his arrests were extensively covered in the media.

22.     Investigator Chin's superior performance has been noted by other professionals. In one instance, around November 23, 2016, Senior Attorney Samuel J. Finnessey, Jr. of the Office of School Personnel Review and Accountability (OSPRA) of the New York State Department of Education wrote to former SCI Commissioner Richard Condon to thank SCI for its assistance, and particularly commended Investigator Chin for his "thorough and professional investigation." Attorney Finnessey, calling Investigator Chin "one of the top investigators [he has] come across in terms of his investigative skills, preparedness, and testimony" went on to say that OSPRA could not have achieved the successful outcome without Investigator Chin's "complete and thorough investigation" and "his live testimony."

23.     Despite his good performance, Investigator Chin was never promoted.

24.     Investigator Chin also was never made aware of any meaningful opportunities for promotion or transfer into another position at SCI, unlike non-Chinese

investigators. In effect, it was represented to Investigator Chin that any promotions or job transfers were not available to him because he was Chinese-American. Had he known about openings available to the SCI investigators, Investigator Chin would have applied for them.

25.     Before around May 2018, SCI only openly advertised an available position at SCI once it has already identified the person whom it would hire or promote. By then, the purpose of these postings was almost always only to obtain approval, known as a "waiver," to hire the selected candidate who often already had a public pension. Without this "waiver," public employers such as SCI may not hire someone who already has a public pension for any position above a certain earnings level. Once SCI met this minimum requirement, it quickly took off any advertising of openings. Unless SCI Investigators were constantly monitoring openings on the SCI website or job boards, they usually only learned of vacancies once the positions have already been filled.

26.     This internal promotion policy and practice resulted in only non-Chinese SCI investigators being promoted.

27.     SCI does not conduct regular evaluations of investigators' performance or regularly give merit raises. As a result, Investigator Chin has never received a formal evaluation of his work at SCI and has ever only received contractual raises.

28.     In September 2012, for the first time, Investigator Chin was disciplined in the workplace. Investigator Chin was disciplined for interviewing the subject of one of his investigations over the phone and inaccurately stating in a case memorandum and written report that the interview took place in person. Investigator Chin had made several attempts to interview the subject in person by visiting his home to no avail. Investigator

Chin then interviewed him over the phone when the subject called in response to Investigator Chin's visits. The then-Chief Investigator of SCI, Thomas Fennell, met with Investigator Chin and warned him that another similar instance would lead to the termination of his employment, even though Chief Fennell also acknowledged that this was a common practice among investigators at SCI. Investigator Chin admitted his error and promised that he would not commit this mistake again.

29.    A memorandum memorializing the meeting was placed in Investigator Chin's personnel file. Investigator Chin was not subject to any other penalty.

30.    Upon information and belief, non-Chinese-American employees were not disciplined for similar actions.

31.    Around nine months later, in or around May 2013, in a meeting that included then-Leader Louis Torrellas for Team 1, Chief Fennell told Investigator Chin to look for another job. When Investigator Chin asked him for the reason, Chief Fennell declined to say. When Investigator Chin asked how he should improve his performance, if poor performance was the reason for SCI's desire for him to leave, Chief Fennell then stated that Investigator Chin's work performance was not "a key issue," and that Chief Fennell didn't "care about good work or arrests." Chief Fennell also told Investigator Chin that he was not "following the unwritten rules." Investigator Chin understood that to mean he did not fit in the clubby culture that existed among the SCI investigators, who were nearly all non-Chinese and mostly white.

32.    On or around June 24, 2016, it was announced via email that the then-Commissioner Richard Condon had promoted Noemi Baez Martin to be an Assistant Supervisor for Team 1. Martin, a Latina, had worked at SCI since in or around 2014 only.

Upon information and belief, prior to working at SCI, Martin worked at the Civilian Complaint Review Board (CCRB) and had no prior sex-crime-related investigatory or supervisory experience. When Martin first started as an investigator at SCI, she was assigned to shadow Investigator Chin as he worked on his investigations of sex-related crimes.

33.     Investigator Chin was as qualified, if not more qualified, as Martin for this promotion. Had Investigator Chin known about this opportunity, he would have applied for this position.

34.     Similarly, on December 1, 2016, it was announced via email that the then-Commissioner Richard Condon had promoted Investigator Ronald Connors to be an Assistant Supervisor for Team 1. Upon his information and belief, Connors did not have any significant supervisory experience prior to this promotion. Connors is a white male.

35.     Investigator Chin was as qualified, if not more qualified, as Connors for this promotion. Had Investigator Chin known about this opportunity, he would have applied for this position.

36.     On or about January 4, 2018, Michael McGarvey retired from SCI as the Fleet Services Manager, a position that was then responsible for the vehicles and other technical equipment used in investigations. Again, there was no posting of this position that would be vacant when McGarvey retired. Although this position was not considered a supervisory position, upon information and belief, it paid more than Investigator Chin's position. Steven King, who is South Asian and had joined SCI only in the prior year, was transferred to this position. The position was eventually split into two positions. Ralph Gerard, a Black male, who previously had worked in SCI's administrative department,

became the Agency Fleet Director. King retained the portion of responsibilities associated with technical equipment.

37.     Investigator Chin was as qualified, if not more qualified, as King for this job transfer. Had Investigator Chin known about this opportunity, he would have applied for this position.

38.     SCI also created and tolerated a racially insensitive environment. After watching Gran Torino, a movie directed by Clint Eastwood, Investigator William LaVasseur, for years intermittently made derogatory remarks about Asian Americans and used terms such as "chink," "gook," and "fish-head" in conversations with Investigator Chin and other investigators. At least once, instead of calling Investigator Chin by his actual name, LaVasseur referred to Investigator Chin as a "fish-head." Although LaVasseur tried to make these comments outside of the presence of supervisors, SCI supervisors, including the then Team 1 Leader Louis Torrellas, heard these comments and did not stop them. LaVasseur was later promoted to be a Team Leader in 2015.

39.     In 2017, around the time the Department of Investigation ("DOI") was pursuing greater control over SCI, SCI staff were given mandatory EEO seminars. In or around August 2017, Chantal N. Senatus, the EEO Officer for DOI, conducted a mandatory EEO seminar on basic employment policies and protections. This was the first time since he was hired that Investigator Chin could remember he was trained on his rights as an employee. Investigator Chin learned from the seminar that similarly-situated employees must be treated similarly, regardless of race.

40.     After the EEO seminar, DOI staff sent the entire staff at SCI the written EEO policy as a follow-up.

41.     In late November 2017, EEO Officer Senatus also confirmed to the SCI staff that she was the Acting EEO Officer for SCI and that Rich Marin, Ann Ryan, and Jessica Villanueva, employees at SCI, were EEO Counselors. This was the first time that Investigator Chin could remember being told that Marin, Ryan, or Villanueva were EEO Counselors for SCI.

42.     Shortly after this email, Investigator Chin contacted EEO Officer Senatus and asked to see her. Senatus met with Investigator Chin in her office shortly thereafter. Investigator Chin explained to her that he believed that promotions at SCI should be made based on merit, but that he was discounted because he was Chinese-American. At one point, Senatus responded to the effect that, "You are really pushing this Asian thing." Investigator Chin confirmed that he believed that he was being discriminated against because he was Chinese-American. Eventually Senatus said that Investigator Chin was better off filing a complaint of discrimination on his own.

43.     On December 6, 2017, Investigator Chin filed a complaint of discrimination with the New York State Division of Human Rights (NYSDHR), alleging that SCI discriminated against him and failed to promote him because of his race (and age).

44.     On or around April 17, 2018, SCI submitted a Verified Answer in response to his NYSDHR complaint and claimed that Investigator Chin was unqualified for any promotion because of his "serious misconduct [in 2012] for which he narrowly averted termination of employment", and that act "rendered him unqualified for a supervisory position."

45.     However, other non-Chinese-American employees who had committed serious misconduct, or who had been accused of such, were nevertheless promoted. In this way, Investigator Chin was treated differently from and more harshly than non-Chinese-American employees.

46.     For example, Investigator William LaVasseur was promoted, first to an Assistant Team Leader and then to a Team Leader, although he had acted aggressively toward his fellow investigators and even provoked physical fights with his fellow investigators, in addition to making derogatory comments about Asians as set forth in paragraph #38. Prior to his promotions, LaVasseur was an investigator at SCI and, upon information and belief, did not have any supervisory experience.

47.     Rather than because of any misconduct, the real reason Investigator Chin was not promoted or offered a job transfer was discrimination based upon or because of his Chinese-American.

*SCI Retaliated Against Investigator Chin After He Complained of Discrimination*

48.     After Investigator Chin filed the NYSDHR complaint in December 2017, SCI was ever more critical of Investigator Chin's work-related conduct.

49.     In or around September 2017, the subject of one of Investigator Chin's investigations ("Investigation #1") complained that the investigation over his alleged misconduct was still unresolved even though he was told that "his case was closed." The complaining subject did not allege that it was Investigator Chin who divulged this information.

50.     Although the subject did not mention Investigator Chin when he complained, Brisogna, Continanzi, and Investigator Chin's supervisor at the time, Jeff

Anderson met with Chin and warned him that he should not inform subjects of his investigations that their cases were unsubstantiated and would be closed by SCI. Investigator Chin unequivocally denied that he had informed the subject that the investigation was closed, and objected to the warning. Nevertheless Brisogna and Anderson verbally reprimanded Investigator Chin despite Investigator Chin's denials. Other than the verbal reprimand, they did not take any other action.

51.    In or around January 2018, shortly after he filed his NYSDHR complaint in December of 2017, Investigator Chin was accused again that he had informed a subject of an investigation ("Investigation #2") that his case would be closed by SCI because the allegations against the subject were unsubstantiated. Investigator Chin again unequivocally denied this accusation. Nevertheless, Brisogna, Continanzi, and Anderson disregarded Investigator Chin's denials or explanation and gave him a verbal warning.

52.    Upon information and belief, even if the accusations against Investigator Chin regarding providing information to subjects about the status of investigations were true, other non-Chinese-American investigators were not disciplined for similar infractions.

53.    For example, New York Post reported on or around October 16, 2018 that Investigator Miguel Ruiz, joined by Martin, who had been promoted to be an Assistant Supervisor, informed a student witness in an investigation of a high school teacher who was accused of having excessive text contact with him that the case would be closed because "nothing happened." Upon information and belief, Investigator Ruiz was not reprimanded or disciplined for providing this information, and neither was Supervsior Martin who did not correct Investigator Ruiz.

54. In or around February 2018, a witness emailed Investigator Chin in a case involving a male teacher who was accused of being inappropriately friendly with his students ("Investigation #3"). The witness was upset when the subject of the investigation contacted her directly and that her identity as a cooperating witness might have been compromised. The witness had provided Investigator Chin access to her Instagram account to review photographs that the subject had posted of him and his students.

55. Bisogna, Continanzi and Anderson met with Investigator Chin about Investigation #3 and admonished Investigator Chin for not redacting materials that were provided by the witness and shown to this subject during questioning. Investigator Chin conceded that it would have been more prudent that information was redacted. However, Investigator Chin also pointed out that, although his investigations were overseen by SCI attorneys, during nearly 12 years of employment, he had never been instructed to redact a document previously. Other non-Chinese American investigators similarly did not make redactions and were not admonished.

56. On or around March 15, 2018, Bisogna, Continanzi and Anderson convened a disciplinary meeting, during which they reprimanded Investigator Chin concerning his performance and in particular his failure to redact a document in Investigation #3. During this short meeting, they showed Investigator Chin a lengthy write-up that was highly critical of his performance. Although Investigator Chin requested a copy of this write-up, they declined to give him one.

57. Upon information and belief, non-Chinese-American employees were not disciplined for failure to redact a document. The real reason Investigator Chin was disciplined was discrimination based upon or because of his Chinese-American race.

58.     On or about May 23, 2018, NYSDHR dismissed Investigator Chin's complaint for untimeliness.

59.     On June 6, 2018, then-Acting Special Commissioner Susan Lambiase, issued a memorandum to Investigator Chin that he would be suspended without pay for 14 days. Lambiase cited as the basis for this suspension Investigator Chin's supposed disclosures about case status in September 2017 (Investigation #1) and January 2018 (Investigation #2) and the February 2018 incident regarding the failure to redact a document (Investigation #3). Lambiase wrote that the "effective dates of [Investigator Chin's] suspension [would] take place in the near future and [would] be worked out with the Department of Education." Investigator Chin was given no further notice and his suspension without pay started a day later and lasted from June 7, 2018 through June 20, 2018.

60.     Upon information and belief, SCI has rarely, if ever, suspended a non-Chinese-American investigator from work without pay even though other investigators commit similar or more egregious misconduct. The real reason for Investigator Chin's work suspension without pay was discrimination based upon or because of his Chinese-American race.

61.     Upon information and belief, SCI timed this retaliatory action and waited until such time when the NYSDHR complaint was dismissed before issuing the written memorandum and effectuating Investigator Chin's work suspension without pay immediately.

62.     Defendants' disciplinary actions toward Investigator Chin were different from and harsher than the actions taken against other similarly-situated employees who

were not Chinese-American. Defendants' actions showed that they were aware that Investigator Chin was engaging in protected activity and they disciplined him more harshly because of this activity.

63.     Investigator Chin was deeply humiliated by this disciplinary action and suffered severe mental anguish and emotional distress.

64.     In response to this work suspension, Investigator Chin sought to provide SCI corroboration that he did not inform subjects of his investigations that their cases would be closed or deliberately or carelessly reveal the identity of a complainant or witness.

65.     In or around February 2019, Investigator Chin filed a Charge of Discrimination with the Equal Employment opportunity Commission (EEOC) on the basis that SCI retaliated against him by suspending him from work and taking other selective disciplinary actions once he filed the NYSDHR complaint of discrimination.

66.     On or around June 18, 2019, Investigator Chin received notice from EEOC that SCI had submitted a response and position statement to his charge of retaliation on or around April 12, 2019.

67.     Defendants' actions were intended to – and did – discriminate against Investigator Chin based upon or because of his status as a Chinese-American.

68.     Defendants treated Investigator Chin more harshly than his similarly-situated counterparts based upon or because of his status as a Chinese-American.

69.     Defendants undertook all of the actions and omissions alleged above either directly, or through their agents who were authorized to undertake such actions and omissions.

70.     The actions and omissions alleged hereinabove were willful.

71.     As a result of Defendants' discriminatory and retaliatory conduct toward Plaintiff, Plaintiff has suffered economic harm including loss of past and future income, mental anguish and emotional distress.

72.     Because of Defendants' malicious, willful and outrageous conduct, which was undertaken with full knowledge that such actions were illegal, Plaintiff seeks, and is entitled to, punitive damages from the Defendants.

FIRST CAUSE OF ACTION
(Discriminatory Discipline, and Failure to Promote in Violation of Section 1981)

73.     Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

74.     By the actions set forth above, among others, Defendants have discriminated against the Plaintiff in violation of Section 1981. Defendants failed to promote or offer any meaningful opportunity to apply for promotions or transfers Plaintiff, and discriminately disciplined him because of his race as a Chinese-American.

75.     As a result of Defendants' illegal actions, Plaintiff has suffered, and continues to suffer, economic harm including loss of past and future income, mental anguish, and emotional distress for which he is entitled to damages.

76.     Defendants' actions were malicious, willful, and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

77.     Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

78.     Defendants retaliated against Plaintiff for his complaints of discrimination because of his race as a Chinese-American by disciplining him for infractions or instances of misconduct that non-Chinese-American investigators were not similarly disciplined for.

79.     As a result of Defendants' illegal retaliation, Plaintiff has suffered, and continues to suffer, economic harm including loss of past and future income, mental anguish, and emotional distress for which he is entitled to damages.

80.     Defendants' retaliatory actions were malicious, willful, and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Discriminatory Discipline, and Failure to Promote
### in Violation of New York State Human Rights Law)

81.     Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

82.     By the actions set forth above, among others, Defendants have discriminated against the Plaintiff in violation of the New York State Human Rights Law, Executive Law § 290 et. seq.

83.     Defendants failed to promote Plaintiff or offer any meaningful opportunity to apply for promotions or transfers Plaintiff, and discriminately disciplined him because of his race as a Chinese-American.

84.     Defendants' actions were in direct violation of the New York State Human Rights Law.

85.     As a result of Defendants' willful and illegal actions, Plaintiff has suffered, and continues to suffer, economic harm including loss of past and future income, mental anguish, and emotional distress for which he is entitled to damages.


FOURTH CAUSE OF ACTION
(Retaliation in Violation of New York Human Rights Law)

86.     Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

87.     Defendants retaliated against Plaintiff for his complaints of discrimination because of his race as a Chinese-American by disciplining him for alleged infractions or instances of misconduct that non-Chinese American investigators were not similarly disciplined for.

88.     As a result of Defendants' illegal retaliation, Plaintiff has suffered, and continues to suffer, economic harm including loss of past and future income, mental anguish, and emotional distress for which he is entitled to damages.


FIFTH CAUSE OF ACTION
(Discriminatory Discipline, and Failure to Promote in Violation of the City Law)

89.    Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

90.    By the actions set forth above, among others, Defendants have discriminated against the Plaintiff in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq. Defendants failed to promote Plaintiff or offer any meaningful opportunity to apply for promotions or transfers Plaintiff, and disciplined him more harshly because of his race as a Chinese-American.

91.    As a result of Defendants' illegal actions, Plaintiff has suffered, and continues to suffer, economic harm including loss of past and future income, mental anguish, and emotional distress for which he is entitled to damages.

92.    Defendants' actions were malicious, willful, and wanton violations of the City Law for which Plaintiff is entitled to an award of punitive damages.

<u>SIXTH CAUSE OF ACTION</u>
<u>(Retaliation in Violation of the City Law)</u>

93.    Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

94.    Defendants retaliated against Plaintiff for his complaints of discrimination based upon or because of his race as a Chinese-American by disciplining him more harshly than non-Chinese American investigators.

95.    As a result of Defendants' illegal retaliation, Plaintiff has suffered, and continues to suffer, economic harm including loss of past and future income, mental anguish, and emotional distress for which he is entitled to damages.

96.     Defendants' retaliatory actions were malicious, willful, and wanton violations of the City Law for which Plaintiff is entitled to an award of punitive damages.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

WHEREFORE, Plaintiff requests that this Court enter an Order:

a.  assuming jurisdiction over this action;

b.  declaring Defendants violated Section 1981, the NYSHRL, and City Law;

c.  permanently enjoining Defendants from further violations of Section 1981, the NYSHRL, and City law;

d.  granting judgment to Plaintiff on his Section 1981, NYSHRL, and City Law claims in amounts to be determined at trial;

e.  awarding Plaintiff punitive damages as allowable by law;

f.  awarding Plaintiff prejudgment and postjudgment interest as allowed by law;

g.  awarding Plaintiff his costs and reasonable attorneys' fees; and

h.  granting such further relief as the Court deems just and proper.

DATED:     New York, NY
           June 21, 2019
                KAKALEC LAW PLLC


           _Karen Kithan Yau_
           Of Counsel
           85 Broad Street, 16th Floor
           New York, NY 10004
           (347) 661-7490
           Karen@KakalecLaw.com